**AFFIDAVIT IN SUPPORT OF**
**APPLICATIONS FOR SEARCH WARRANTS**

I, Benjamin Hickok, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for warrants for information associated with certain accounts that is stored at premises controlled by Google, located at 1600 Amphitheater Way, Mountain View, CA; Yahoo! (Oath Holdings Inc.), located at 701 First Avenue, Sunnyvale, CA; and Hotmail (Microsoft) located at One Microsoft Way Redmond, WA, which companies are providers of electronic communication service and remote computing services.  The information to be searched is described in the following paragraphs and in Attachments A.  This affidavit is made in support of applications for search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Google, Yahoo, and Microsoft to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachments B.  Upon receipt of the information described in Section I of Attachments B, government-authorized persons will review the information to locate the items described in Section II of Attachments B.

2.      I am a Special Agent ("SA") of the United States Department of Commerce, Office of Export Enforcement ("DOC/OEE"), currently assigned to the Boston Field Office located in Boston, Massachusetts and have been so employed since October 2016.  Prior to being employed with the U.S. Department of Commerce, I was employed as a Special Agent with the U.S. Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations, for approximately three years.  I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia, specifically, the Criminal Investigative Training Program and Homeland Security Investigations Special Agent Training.  Among other

1

things, I am responsible for conducting and assisting in investigations of violations of U.S.

export control laws.  During my employment as a Special Agent, I have participated in the

execution of numerous search warrants, arrest warrants, and physical surveillance operations.  In

addition, I have training and experience in interviewing and debriefing defendants who have

violated federal law. In connection with my duties and responsibilities as a law enforcement

officer, I have testified in judicial proceedings and prosecutions.  Through such investigations

and training, I am familiar with techniques and methods of operation used by individuals

involved in criminal activity to conceal their activities from detection by law enforcement

authorities.

3.      I have personally participated in this investigation and have witnessed many of

the facts and circumstances described herein. In addition, I have received information from other

federal law enforcement officials, federal government officials, and industry sources. I also have

reviewed documents obtained during the course of the investigation. The statements contained in

this affidavit are based on my own observations and review of documents, or reliable

information provided to me by the other personnel identified above. This affidavit is being

submitted for the limited purpose of obtaining a search warrant. Accordingly, while this affidavit

contains material information I am aware of that is pertinent to the requested search warrant, it

does not include every fact known by me or other investigators concerning the investigation.

Unless otherwise indicated, all written and oral statements referred to herein are set forth in

substance and in part, rather than verbatim.

4.      Based on my training and experience and the facts set forth in this affidavit,

there is probable cause to believe that HAMED ALIABADI (a/k/a AIDEN DAVIDSON),

(herein "ALIABADI"), of Manchester, New Hampshire, (d/b/a GOLDEN GATE

INTERNATIONAL) and others yet unknown to investigators may be involved in the illegal

export/diversion of industrial equipment to the Islamic Republic of Iran, in violation of 50 U.S.C.

1701-1706 (International Emergency Economic Powers); 18 U.S.C. 554 (Smuggling); 31 C.F.R

560.203, 560.204, and 560.206 Code of Federal Regulations, Section 560.204 (regulations

prohibiting the export of U.S. goods to Iran), Title 18, United States Code, Section 371, and

other possible violations. There is also probable cause to search the information described in

Attachments A, specifically, the three email accounts ▓▓▓ **other@gmail.com**,

▓▓▓▓▓▓**_trading_co@yahoo.com** and ▓▓▓▓**2000@hotmail.com** maintained by Google,

Yahoo!, and Microsoft, respectively, (the "SUBJECT ACCOUNTS"), for the items described in

Attachments B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrants because it is a "court

of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) &

(c)(1)(A).  Specifically, the Court is a "district court of the United States . . . that has jurisdiction

over the offense being investigated."  18 U.S.C. § 2711(3)(A)(ii).

## RELEVANT EXPORT STATUTES AND REGULATIONS

6.      The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§

1701-1706, authorized the President of the United States ("the President") to impose economic

restrictions on a foreign country in response to an unusual or extraordinary threat to the national

security, foreign policy, or economy of the United States when the President declared a national

emergency with respect to that threat.  Pursuant to the authority under the IEEPA, the President

and the executive branch have issued orders and regulations governing and prohibiting certain

transactions with Iran by U.S. persons or involving U.S.-origin goods.

3

7.      On March 15, 1995, President William Jefferson Clinton issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat."  Executive Order No. 12957, as expanded and continued by Executive Order Nos. 12959 and 13059, was in effect at all times relevant to this investigation.  Presidents George W. Bush and Barack Obama continued and maintained the restrictions instituted against Iran by President Clinton. To date, President Donald Trump has also continued and maintained the restrictions.

8.      Executive Order Nos. 12959 and 13059 (collectively, with Executive Order No. 12957, "Executive Orders") imposed economic restrictions on Iran.  The Executive Orders prohibited, among other things, the exportation, re-export, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person. The Executive Orders also prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

9.      The Executive Orders authorized the United States Secretary of the Treasury, in consultation with the United States Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the Executive Orders.  Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part 560, implementing the restrictions imposed by the Executive Orders.

10.      The ITSR prohibited, among other things, the export, re-export, sale, or supply, directly or indirectly, of any goods, technology, or services from the United States or by a United

States person, wherever located, to Iran or the Government of Iran, without prior authorization or license from the United States Department of the Treasury, through the Office of Foreign Assets Control.  The Executive Orders and the ITSR were in effect at all times relevant to this investigation.

11.    The ITSR imposed, among others, the following prohibitions:

Section 560.203 - Prohibition of any Transaction to Evade or Avoid the Embargo and any Attempt to Violate the Embargo:

Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.

Section 560.204 - Prohibition of any Sale or Supply of any Goods, Technology, or Services to Iran or the Iranian Government:

Except as otherwise authorized [by a license issued by OFAC], the exportation, re-export, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, ... sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

(a)    Such goods, technology, or services are intended specifically for supply ... directly or indirectly, to Iran or the Government of Iran ...

Section 560.206 - Prohibited trade-related transactions with Iran; goods, technology or services:

Except as otherwise authorized [by OFAC], ... no United States person, wherever located, may engage in any transaction or dealing in or related to ... goods, technology or services for exportation, re-export, sale or supply, directly or indirectly, to Iran or the government of Iran.

**REPORTS OF THE AUTOMATED EXPORT SYSTEM (AES)**

5

12.     Pursuant to United States law and regulation, exporters and shippers or freight forwarders are required to file certain forms and declarations concerning exports of goods and technology from the United States. Typically, those filings are filed electronically through the Automated Export System administered by the U.S. Department of Homeland Security ("DHS"), in Washington, D.C. One such required filing is the Electronic Export Information ("EEI"), formerly known as a Shipper's Export Declaration. The EEI must be filed when the value of the commodity classified under each individual Schedule B number is over $2,500 or if a validated export license is required to export the commodity. The Schedule B number is a 6 digit international export code to identify the goods being exported.  In such a standard export transaction, the exporter or the U.S. Principal Party in Interest (USPPI) is responsible for preparing the EEI.

13.     An essential and material part of the EEI as well as other export filings is information concerning the end-user or ultimate destination of the export. In many cases, the identity of the end-user determines whether the goods may be exported:

     (a)     Without any specific authorization from the U.S. government;

     (b)     Whether the goods may be exported only with the specific authorization of or a validated license from the Commerce Department or Treasury Department, or;

     (c)     Whether the goods may not be exported from the United States.

14.     When submitting an EEI through the Automated Export System, the exporter or entering party must certify that all statements made and all information contained therein is true and correct. The exporter or entering party is also informed that submitting false or fraudulent

statements is punishable by both civil and criminal penalties under 13 U.S.C. § 305, 22 U.S.C. § 401, 18 U.S.C. § 1001 and 50 U.S.C. App. 2410.

## SUBJECT ACCOUNTS

15.     According to information obtained under a section 2703(d) COURT ORDER, **other@gmail.com** is registered to an individual by the name of Hamed 20. The email account was created on May 21, 2008 and has a listed recovery email of hamed@gmail.com and Hamed._____@phelma.grenoble-inp.fr. The subscriber for the account lists a phone number of 603-___-5036 which indicates from the area code that the telephone number is located in New Hampshire.

16.     According to information obtained under a section 2703(d) COURT ORDER, **trading_co@yahoo.com** is registered to Mr. Babazadeh Trading Corporation. The email account was created on June 12, 2007 and has alternate emails listed as info@_____-corp.com, ___norouzi@yahoo.com, and ___@babazadeh-corp.com. The subscriber for the account lists a phone number of _____0934 which indicates from the dialing code that the telephone number is located in the country of Iran.

17.     According to information obtained under a section 2703(d) COURT ORDER, **2000@hotmail.com** is registered to Ali Turan. The email account was created on November 16, 2005 and has an alternate email listed as ____2006@yahoo.com.tr. The subscriber for the account lists a phone number of _____9656 which indicates from the dialing code that the telephone number is located in the country of Turkey.

## PROBABLE CAUSE

18.     In 2016, DOC/OEE and DHS/HSI initiated an investigation that was developed through information provided by analysts from the Department of Commerce's Office of Export

Analysis (OEA). The information was gathered via the Automated Export System (AES), which revealed seven (7) Electronic Export Information (EEI) filings in which GOLDEN GATE INTERNATIONAL LLC, located at 80 Dunbarton Road, Apt 23, Manchester, NH 03102 was listed as the U.S. Principal Party in Interest (USPPI). Further analysis revealed that STARE LOJISTIK ENERJI SANAYI TICARET (a/k/a STARE LOJISTIK ENERJI SANAYI TICARET) in Igdir, Turkey was listed as the ultimate consignee in all seven (7) EEIs. The following is a summary of the EEIs:

- On or about March 10, 2014, an EEI bearing Internal Transaction Number (ITN) X20140310050519 was filed for a shipment valued at approximately $130,488 USD and whose contents were described as equipment such as motors, pumps, tools, and other miscellaneous items.

- On or about March 14, 2014, an EEI bearing ITN X20140314055899 was filed for a shipment valued at approximately $144,625 USD and whose contents were described as equipment such as engines and pumps.

- On or about August 14, 2014, an EEI bearing X20140814767209 was filed in for a shipment valued at approximately $166,000 USD and whose contents were described as equipment such as machinery parts, motors, and other miscellaneous items.

- On or about September 5, 2014, an EEI bearing ITN X20140905939581 was filed for a shipment valued at approximately $171,450 USD and whose contents were described as equipment such as machinery parts and pumps.

- On or about September 25, 2014, an EEI bearing ITN X20140925998128 was filed for a shipment valued at approximately $40,500 USD and whose contents were described as equipment such as machinery parts, pumps, and motors.

- On or about April 30, 2015, an EEI bearing ITN X20150430518194 was filed for a shipment valued at approximately $80,000 USD and whose contents were described as equipment such as machinery parts and pumps.

- On or about May 7, 2015, an EEI bearing X20150507880632 was filed for a shipment valued at approximately $100,000 USD and whose contents were described as machinery parts and pumps.

19.     A geolocation analysis for Igdir revealed it is a city located in eastern Turkey that is approximately 30 miles from the Turkish-Iranian border.

20.     Further review of the EEIs revealed that the shipments contained construction equipment and other machinery, pumps, motors, pneumatic tools, etc.  The method of transportation used for these shipments was via vessel (containerized) through the Savannah, Georgia Port of Export.  The freight forwarding agent was identified as Priority Worldwide Services ("Priority") in Hanover, Maryland.

21.     In addition, all seven (7) EEIs were assigned license type "C33" and had "NLR" listed in the License Code field. An exporter must report on any required EEI filing to the AES the correct license code/license exception code based on the items being exported. When using the No License Required "NLR" designation for the items that are subject to the EAR but not listed on the Commerce Control List (CCL) (i.e., items designated as EAR99), an exporter uses license code "C33." The CCL is a list of items under the export control jurisdiction of the U.S. Department of Commerce, Bureau of Industry and Security (DOC/BIS). The CCL is found in

Supplement No. 1 to part 774 of the EAR; however, exports to an embargoed destination, an end-user of concern or in support of a prohibited end-use may require an export license from the Department of Treasury, Office of Foreign Assets Control (OFAC) irrespective of whether they are designated as EAR99 items or are items on the CCL.

22.     In April 2016, investigating agents accessed the STARE LOJISTIK (ultimate consignee) website, which was in the Turkish language, but reviewed it utilizing a translate function via the Google search engine. The website revealed that the domain STARELOJISTIK.COM is registered in Igdir, Turkey, and is hosted on IP 94.73.147.10, which is located in Turkey. A follow up search done in April 2017 showed the company was using the same hosted IP 94.73.147.10. The search also revealed that STARELOJISTIK.COM is registered to one of the Subject Accounts,          **2000@hotmail.com**.

23.     According to the website, STARE LOJISTIK is an import and export freight forwarder/logistics company, and does not purport to be an end-user. According to the "main home page" tab, STARE LOJISTIK offers transportation services to Afghanistan, Kazakhstan, Kyrgyzstan, Uzbekistan, Turkmenistan, Tajikistan, Azerbaijan, Georgia, and Iran. Under the "services" tab, the company reiterated offers for affordable transportation/delivery services throughout the Turkic Republics of Iraq and Iran, as well as throughout Europe.

24.     In 2012, ALIABADI, a citizen and national of the Islamic Republic of Iran, became a U.S. legal permanent resident (LPR) by U.S. Citizenship and Immigration Services (USCIS).

25.     Passenger name record (PNR) checks revealed that on October 6, 2013, ALIABADI, traveling on his Iranian passport, departed IST International Airport in Turkey, on a Turkish Air flight, and arrived at John F. Kennedy (JFK) International Airport in New York.

ALIABADI was referred to secondary inspection by CBP officers, whereupon he declared $15,000 USD to CBP. ALIABADI stated that he was returning to the U.S. after staying in Turkey and Iran for three months. Thereupon, ALIABADI filed a FinCEN Form 105, Report of International Transportation of Currency or Monetary Instruments (CMIR), bearing no. 2013C470115656, for the money.  ALIABADI was admitted and departed the inspection area without further incident.

26.     A search of the New Hampshire (NH) Department of State, Corporation Division's on-line registry records revealed that GOLDEN GATE INTERNATIONAL, LLC is a domestic limited liability company and Hamed ALIABADI is the manager/member and registered agent. In addition, GOLDEN GATE INTERNATIONAL, LLC was initially registered in November 2013, and according to the certificate of formation provided by ALIABADI, the company is involved in the import and export of hydraulic pumps and motors.

27.     On or about October 27, 2014, ALIABADI, traveling on his Iranian passport, departed Tabriz (TBZ) International Airport in Tabriz, Iran, and arrived at IST Airport in Turkey. Thereupon, ALIABADI boarded a Turkish Air flight, and arrived at BOS Airport in Boston. ALIABADI was referred to secondary inspection by CBP officers and stated that he was returning from a six-week trip to Iran, Italy, Spain, France and Turkey. During the inspection, ALIABADI indicated to CBP officers that he resided at 80 Dunbarton Road,      in Manchester, NH. Finally, ALIABADI provided home telephone number (603)    9087 and email    fxx@gmail.com as his contact references. ALIABADI was admitted and departed the inspection area without further incident.

28.     In August 2015, ALIABADI submitted a Form N-400 (Application for Naturalization) to USCIS, in which he provided that he is employed by GOLDEN GATE

INTERNATIONAL, LLC. Pursuant to the submission of said Form N-400, ALIABADI was interviewed by USCIS officer(s) in Bedford, NH. During the interview, ALIABADI was questioned about his employment, to which he stated that he was involved in the domestic and international sale of hydraulic pump parts; that his salary was approximately fifty-five thousand ($55,000) dollars a year; and that he did not ship said items to Iran.

29.     Further review of ALIABADI's Form N-400 application revealed that it included a Petition for Name Change with the U.S. District Court if New Hampshire, indicating that upon naturalization, ALIABADI planned to change his legal name to Aiden DAVIDSON. During the interview, ALIABADI was questioned by USCIS officer(s) about his petition, to which he stated that upon approval for naturalization, he intended to keep both his Iranian and U.S. citizenship, for entering/exiting (crossing) Iran.

30.     On or about August 15, 2015, ALIABADI departed TBZ Airport in Iran, and arrived at IST Airport in Turkey. Thereupon, ALIABADI boarded a Turkish Air flight, and arrived at the Boston Airport. ALIABADI was referred to secondary inspection by CBP officers and stated that he was returning from a trip to Iran and Turkey. He stated that he lived at 80 Dunbarton Road        Manchester, NH and that he had a part time job selling hydraulic pumps on eBay in the U.S. ALIABADI stated that he didn't work for anybody and had no name for his business. CBP officers asked ALIABADI if he exported items to Iran, during which he became agitated and claimed that CBP had no authority to inspect his baggage. CBP officers again asked ALIABADI about his shipping activities, to which he stated that he was not that stupid to do such a thing. CBP officers noted that ALIABADI became more irritated and nervous when CBP was looking at hydraulic manuals and part numbers, diagrams, and pamphlets that were in his checked baggage. CBP officers advised ALIABADI about the embargo regulations regarding

Iran. CBP officers did not find any export/import documents, just clothes, nuts, sweets and alcohol. ALIABADI was admitted and departed the inspection area without further incident.

31.     On or about December 15, 2015, a passenger vehicle bearing NH tag ░░░1577 arrived at the CBP Highgate Springs Port of Entry (POE) in Swanton, Vermont (VT). Upon arrival in the inspection area, the driver identified himself as ALIABADI and provided his Iranian passport and U.S. permanent resident card to CBP officers. ALIABADI stated that he bought industrial parts (electrical or hydraulic), which he sold on eBay. He claimed to sell only within the U.S. because of the hassles of dealing with international transactions. ALIABADI stated that he was returning from Canada with "Qty of Control Panels" and miscellaneous electrical connections purchased from Ritchie Bros Auctioneers (Canada) LTD, located at 9500 Glenlyon Parkway, Burnaby BC, Canada V5J0C6, and bearing a pickup location of 1373 Rue Briere, Mont-Saint-Hilaire, QC CAN J3H6E9.  ALIABADI also had in his possession an invoice from CIA Encanteurs Industriels Canadiens Inc., located at 58 De Bresoles, Suite 1, Montreal, Quebec, H2Y1V5. The invoice was for "various surplus parts" which included orbital motors, block valves and pumps purchased on 11/24/2015 in the amount of $31,993.95 USD. ALIABADI advised CBP that he was in the process of going through a broker before making arrangements to pick up this shipment. The paperwork also reflected a deposit of $12,000 and two Visa payments of $9,993.95 and $10,000. ALIABADI was admitted and departed the inspection area without further incident.

32.     On or about November 18, 2016, ALIABADI became a naturalized U.S. citizen, and his legal name was changed to Aiden DAVIDSON.  Thereupon, in December 2016, ALIABADI/DAVIDSON applied for and was issued a U.S. passport.

33.     On or about December 2, 2016, an EEI bearing X20161202732830 was filed in the AES and listed the ultimate consignee as STARE LOJSTK ENERJ SANAY TCARE located at Cevre Yolu Sanayi Sitesi Yani No. 119, Igdir Vergi Dairesi V.No: 781 04, Igdir 76000, Turkey. The USPPI of the filing was GOLDEN GATE INTERNATIONAL LLC of Manchester, New Hampshire. The merchandise of this filing was loaded into an intermodal (shipping) container, bearing container #FSCU6701619, and valued at approximately $105,666 USD. According to the EEI, the described commodities contained in the shipping container were motors, pumps, valves and other miscellaneous items. The shipment was detained at the Port of Savannah, Georgia, by U.S. Customs and Border Protection (CBP) in order for investigating agents to inspect the items specified in the EEI to verify if they matched the contents in the container.

34.     On or about December 9, 2016, an EEI bearing X20161209102232 was filed in the Automated Export System that listed the ultimate consignee as STARE LOJSTK ENERJ SANAY TCARE located at Cevre Yolu Sanayi Sitesi Yani No. 119, Igdir Vergi Dairesi V.No: 781 04, Igdir 76000, Turkey. The USPPI of the filing was GOLDEN GATE INTERNATIONAL LLC of Manchester, New Hampshire. The merchandise of this filing was loaded into an intermodal (shipping) container, bearing container # TEMU2279332, and valued at approximately $24,928 USD.  According to the EEI, the described commodities contained in the shipping container were motors, pumps, valves and other miscellaneous items. The shipment was detained at the Port of Savannah, Georgia, by U.S. Customs and Border Protection (CBP) in order for investigating agents to inspect the items specified in the EEI to verify if they matched the contents in the container.

35.     During the facilitation of the December 2016 shipments, investigating agents obtained consent to review email messages between Priority Worldwide Services and ALIABADI. ALIABADI was then using email _____hamed@gmail.com to communicate with Priority Worldwide Services and instruct the export.

36.     On or about December 20, 2016, investigating agents from DOC/OEE, DOC/HSI and DHS/CBP inspected the contents of the two shipping containers and verified that they were consistent with the items specified in the EEIs. During the inspection, investigating agents also installed two electronic tracking devices, bearing serial numbers 165758 and 165760, in two separate locations within the contents of container #FSCU6701619. The electronic tracking devices are designed to transmit global positioning system (GPS) signals to satellites that capture their current location and are operated via batteries. No tracking device was placed in the second container, #TEMU2279332.

37.     On or about January 7, 2017, both shipping containers were loaded from the Port of Savannah (GA) onto the vessel Zim Tarragona for export.

38.     On or about February 9, 2017, both tracking devices were transmitting signals indicating that they were at the Port of Mersin, Turkey. The tracking devices continued to send signals that showed movement through the country of Turkey and travel in a north easterly direction.

39.     On or about February 12, 2017, the tracking devices were transmitting signals indicating that they were near the village of Gurbulak, Turkey. Gurbulak is a border crossing village in eastern Turkey with access into the Islamic Republic of Iran.

40.     On or about February 13, 2017, the tracking devices were transmitting signals from Bazargan in the Islamic Republic of Iran. Bazargan is the major land border port for

import/export for the Islamic Republic of Iran.  On or about March 16, 2017, the tracking

devices were transmitting signals near Tehran in the Islamic Republic of Iran.  Thus, according

to the tracking device data, the container never went to STARE LOJSTK ENERJ SANAY

TCARE located at Cevre Yolu Sanayi Sitesi Yani No. 119, Igdir Vergi Dairesi V.No: 781 04,

Igdir 76000, Turkey, but instead went directly from the Port of Mersin to Gurbulak, Turkey, and

then from Gurbulak, Turkey, into the Islamic Republic of Iran.

     41.     On or about March 30, 2017, a license determination was submitted to OFAC

regarding HAMED ALIABADI (a/k/a AIDEN DAVIDSON) of Manchester, New Hampshire,

(d/b/a GOLDEN GATE INTERNATIONAL). The license determination disclosed that a search

by OFAC had no responsive records of applications submitted by or on behalf of any party

named above with respect to the items shipped in containers #FSCU6701619 and

#TEMU2279332. An export license was required for some or all of the items shipped in

container #FSCU6701619 because their final destination was the Islamic Republic of Iran.

     42.     Based on the signals transmitted and in accordance with applicable geo-mapping

software, there is probable cause to suggest that ALIABADI caused a shipment that was diverted

to an unknown consignee or end-user, located in the Islamic Republic of Iran, and that

ALIABADI submitted false paperwork to facilitate diversion to the Islamic Republic of Iran, via

Turkey.

     43.     On or about May 3, 2017, an EEI bearing X20170503712836 was filed in the

AES and listed the ultimate consignee as ARIYANIS GROUP located at MESIHPASA CAD.

KARDESLER IS HANI, KAT: 4 LALELI-AKSARAY in Istanbul, Turkey. According to the

EEI, the shipment consisted of approximately sixty-three (63) displacement pumps and was

valued at approximately $13,000 USD. The USPPI of the filing was listed as GOLDEN GATE INTERNATIONAL LLC.

44.     Agents used open source queries via Google to search the address and company name provided on the EEI. Agents could not find any results for a company named ARIYANIS GROUP located in Istanbul, Turkey.

45.     During the facilitation of the May 2017 shipment, investigating agents obtained consent to review email messages between Priority Worldwide Services and ALIABADI. During these communications, ALIABADI was using email aiden._____@gmail.com to communicate with Priority Worldwide Services and instruct the export.

46.     On or about May 15, 2017, CBP officers, under the direction of investigating agents, held an outbound shipment from ALIABADI (GOLDEN GATE INTERNATIONAL) that was intended for export to Istanbul, Turkey.

47.     On or about May 17, 2017, investigating agents from DOC/OEE and DHS/CBP opened container #CAIU9342177 at the Port of Savannah by taking off seal #192300. Agents inspected the contents of the container to verify what was listed on the EEI. The shipment being exported by GOLDEN GATE INTERNATIONAL consisted of the items that were listed on the EEI.

48.     On or about May 17, 2017, investigating agents from DOC/OEE installed a tracking device inside the shipment ALIABADI was exporting from the U.S. The tracking device (Serial # 165756) sends out GPS signals of the current location and operates via batteries. The tracker was concealed inside a cardboard box that contained the items being exported to ARIYANIS GROUP.

49.     On or about December 11, 2017, I reviewed an archived copy of the location tracking data sent from GPS tracking device serial # 165756. The results showed that the tracker sent out GPS locations from July 20, 2017, to August 1, 2017.

50.     On or about July 20, 2017, the tracking device was transmitting signals indicating that it was near the city of Istanbul, Turkey.  From July 20, 2017, to July 23, 2017, the GPS locations were showing movement through the country of Turkey and travelling in an eastward direction towards the Islamic Republic of Iran.  From July 23, 2017, to July 31, 2017 the tracking device was transmitting signals indicating that it was near the village of Gurbulak, Turkey. Gurbulak is a border crossing village in eastern Turkey with access into the Islamic Republic of Iran.  On or about August 1, 2017, the tracking device was transmitting signals indicating it was in the Islamic Republic of Iran near the city of Tabriz.

51.     Thus, according to the tracking device data, the container went to the city of Tabriz in the Islamic Republic of Iran and not to the ultimate consignee listed on the EEI, ARIYANIS GROUP located at MESIHPASA CAD. KARDESLER IS HANI, KAT: 4 LALELI-AKSARAY in Istanbul, Turkey.

52.     On or about February 3, 2018, a license determination update was submitted to OFAC regarding HAMED ALIABADI (a/k/a AIDEN DAVIDSON) of Manchester, New Hampshire, (d/b/a GOLDEN GATE INTERNATIONAL). The license determination disclosed that a search by OFAC yielded no responsive records of applications submitted by or on behalf of any party named above with respect to the items shipped in container #CAIU9342177. An export license was required for some or all of the items shipped in container #CAIU9342177 because their final destination was the Islamic Republic of Iran.

53.     Based on the signals transmitted and in accordance with applicable geo-mapping software, there is probable cause to suggest that ALIABADI again caused a shipment that was diverted to an unknown consignee or end-user, located in the Islamic Republic of Iran, and that ALIABADI submitted false paperwork to facilitate diversion to the Islamic Republic of Iran, via Turkey.

54.     On two prior occasions during this investigation, I submitted affidavits for search warrants, specifically, on April 21, 2017, in the presence of U.S. Magistrate Judge Andrea K. Johnstone (Case No. 17-mj-39-01-AJ); and on March 23, 2018, in the presence of U.S. Magistrate Judge David J. Lynch (18-mj-57-01-DL), which were authorized by the Court. Those search warrants were executed on web-based email accounts maintained at Google, Inc., namely **aiden.⬜⬜⬜@gmail.com** and **⬜⬜⬜hamed@gmail.com.**  Based on my review of emails obtained pursuant to these search warrants, as well as other evidence gathered during this investigation, these email accounts provide evidence concerning ownership/control of the accounts and evidence of the nature of illegal activities.

55.     Significantly, the search warrants revealed no email correspondence from the accounts **aiden⬜⬜⬜@gmail.com** and **⬜⬜⬜.hamed@gmail.com** with STARE LOJISTIK or ARIYANIS GROUP, who were listed as the ultimate consignees for all the prior shipments exported by ALIABADI.  From my training and experience, U.S. based companies doing business overseas communicate via email with their customers during the course of business transactions.

56.     One email search warrant revealed that on or about April 22, 2015, ALIABADI forwarded an email to one of the Subject Accounts, **⬜⬜⬜_trading_co@yahoo.com,** which referenced an update on a forthcoming export that ALIABADI had organized to ship to

Mersin, Turkey.  Based on the aforementioned historical EEI filing data, referenced in paragraph 18 of this Affidavit, I believe that the shipment ALIABADI was referring to was either the April 30, 2015 or the May 7, 2015 shipment, both of which were said to contain machinery parts and pumps, according to the EEI filings by ALIABADI. The forwarded email was originally between Priority (freight forwarder) and ALIABADI. The email communication discussed pushing back the date to pick up the container being exported, due to delays with the vessel.  It thus appears that ALIABADI was updating _____**_trading_co@yahoo.com** about a delay in shipping the container.

57.     In March 2018, agents accessed the BABAZADEH TRADING website, www.gdatbaba.com, which lists an address in Tehran, Iran. The website sells items such as hydraulic pumps, hydraulic motors, control and steering valves, and other hydraulic accessories and tools. Agents were able to see items listed for sale on the website, including items manufactured in the U.S.  Some of the items included National Stock Numbers (NSNs) 4320-01-035-6896 and 4320-00-630-9286, which were discovered through photographs posted on the website.

58.     According to the Defense Logistics Agency (DLA), a National Stock Number (NSN) is simply the unique and official label applied to an item of supply that is repeatedly procured, stocked, stored, issued, and used throughout the federal supply system. When an NSN is assigned to an item of supply, data is assembled to describe the item. Some data elements include information such as an item name, manufacturer's part number, unit price, and physical and performance characteristics. NSNs are an essential part of the U.S. military's logistics supply chain used in managing, moving, storing, and disposing of material.

59.     Since 2014, ALIABADI has maintained an active registered account as a buyer/reseller with Government Liquidation.  According to its website, Government Liquidation is a liquidity services marketplace and is a contractor of the DLA disposition services for the sale of surplus and scrap assets of the United States Department of Defense (DOD). Government Liquidation is an online sales channel that enables surplus buyers to purchase available government assets.

60.     Agents reviewed documents from Government Liquidation that included invoices, end user statements, and a spreadsheet of completed sales to ALIABADI and GOLDEN GATE INTERNATIONAL LLC. Since 2014, ALIABADI has purchased approximately 2,700 items from Government Liquidation that are surplus from the DOD. Two completed sales included NSNs 4320-01-035-6896 and 4320-00-630-9286, which were discovered in photographs of items for sale on the BABAZADEH TRADING website.    The majority of the other items that ALIABADI purchased were classified as demilitarization code A, but some of the items purchased were classified as demilitarization code Q.

61.     Items classified as demilitarization code A, according to the DLA website, are "items subject to the EAR in parts 773-74 of Title 15, Code of Federal Regulations (CFR) (Commerce Control List or EAR99) and determined by the DOD to present a low risk when released out of DOD control. No demilitarization, mutilation or end use certificate is required. May require an export license from DOC."

62.     Further, according to the DLA website, items classified as demilitarization code Q are, "Commerce Control List Items - Mutilation to the point of scrap required outside the United States.  Inside the United States, mutilation is required when the demilitarization integrity code is '3' and mutilation is not required when the demilitarization integrity code is '6.'"

63.     Based on photographs taken in a prior inspection and completed sales information from Government Liquidation, agents were able to compare two NSNs of demilitarization code A items purchased by ALIABADI that were located in a container ALIABADI exported in December 2016. The container was tracked with a GPS tracking device to the Islamic Republic of Iran, as described in paragraphs 33-40 of this Affidavit.

64.     One of the items photographed displayed NSN 2590-01-193-1773 and is a drive assembly swing. Government Liquidation invoiced GOLDEN GATE INTERNATIONAL LLC on two separate dates when ALIABADI purchased the drive assembly swings with NSN 2590-01-193-1773. This NSN item was used by the U.S. Army in heavy expanded mobility tactical truck applications.

65.     The second item photographed displayed NSN 2950-00-430-3080 and is a turbocharger assembly. Government Liquidation invoiced GOLDEN GATE INTERNATIONAL LLC for purchasing turbocharger assemblies NSN 2950-00-430-3080. This NSN item has been used in diesel engine applications by the U.S. Army, Navy, and Air Force.

66.     During the registration process for an account with Government Liquidation, registrants agree to the terms and conditions associated with purchasing surplus DOD items. In the terms and conditions registrants agree to export restrictions that state, "You may not, without prior U.S. Government authorization, export, re-export, or transfer any goods, software, or technology, either directly or indirectly, to any person, or entity named in the following, but not limited to, OFAC which administers exports to embargoed countries and designated entities." Government Liquidation lists the current embargoed countries (Cuba, Iran, North Korea, Sudan, Syria and Crimea) in the terms and conditions.

22

67.     The e-mail search warrants (referenced in paragraph 54 of this Affidavit) also
revealed multiple email addresses that were later found to be registered to ALIABADI. One
email address discovered was one of the Subject Accounts, ████ **other@gmail.com**. A Grand
Jury Subpoena return for subscriber information related to this account lists a recovery email of
████ **hamed@gmail.com**, a telephone number 603 ████-5036, and an alternate email address
as **Hamed.**████**@phelma.grenoble-inp.fr**. Another email address discovered was
████ **intllc@gmail.com**. A Grand Jury Subpoena return for subscriber information related
to this account lists a recovery email of ████ **fxx@gmail.com** and telephone number 603 ████-
5036. Along with these email addresses, agents discovered other email addresses that
ALIABADI has created. Through my training and experience, I know that individuals will create
and use multiple emails, phone numbers, and aliases to conceal their true identity in an attempt to
evade law enforcement.

68.     Until at least April 28, 2017, telephone number 603-████ 5036 was one of the
telephone numbers ALIABADI listed when conducting business transactions.

69.     In July 2018, agents received a Grand Jury Subpoena return for email account
████ **_trading_co@yahoo.com**. The return provided agents with any email addresses
████ **_trading_co@yahoo.com** communicated with historically.

70.     From January 2013 to July 2016, ████ **other@gmail.com** and
████ **_trading_co@yahoo.com** exchanged approximately 1,775 emails.

71.     From January 2013 to April 2018, ████ **2000@hotmail.com** and
████ **_trading_co@yahoo.com** exchanged approximately 970 emails.

72.     From February 2014 to July 2015, ████ **other@gmail.com**,
████ **_trading_co@yahoo.com**, and ████ **2000@hotmail.com** exchanged

approximately thirty (30) emails together. In February 2015, one of the email exchanges included ▮▮▮▮▮▮ **intllc@gmail.com**.

73.     As previously stated, ALIABADI facilitated seven (7) exports from March 2014 to May 2015 that were destined to ultimate consignee STARE LOJISTIK with registered email address ▮▮▮▮▮▮ **2000@hotmail.com**. The majority of the email communications from the ▮▮▮▮▮▮ **_trading_co@yahoo.com** account took place during this timeframe, suggesting that the parties may have been conspiring to evade U.S. export law.

74.     Based on the email communications summarized above, there is probable cause that ALIABADI may have used email address ▮▮▮▮ **other@gmail.com** to divert multiple shipments to the Islamic Republic of Iran while communicating with ▮▮▮▮▮▮ **_trading_co@yahoo.com** and ▮▮▮▮▮▮ **2000@hotmail.com**. ALIABADI also submitted false paperwork to facilitate the diversion of the shipments to the Islamic Republic of Iran, via Turkey. There is probable cause that the email accounts listed above may contain communications that provide evidence of crimes.

75.     According to passenger analysis records maintained by DHS, on or about June 05, 2017, ALIABADI departed Boston Logan (BOS) International Airport, on a Thomas Cook charter (Condor Airlines) flight arriving at Manchester (U.K.) International Airport on June 06, 2017. In addition, ALIABADI was scheduled on a one-way reservation, and travelling on his U.S. passport. Upon arrival in the U.K., ALIABADI had a scheduled connecting flight to Aberdeen International Airport (DYCE) in Scotland.  Subsequent PNR checks revealed no additional flight reservations could be located for ALIABADI, however, email account **aiden** ▮▮▮▮▮▮ **@gmail.com** was associated with this reservation.

76.     On or about July 07, 2017, ALIABADI, traveling on his U.S. passport, departed

Istanbul Ataturk (IST) International Airport in Turkey, on a Lufthansa flight, and arrived at

Frankfurt International Airport in Germany. Upon arrival, ALIABADI had a scheduled

connecting Lufthansa flight that arrived at Boston Logan International Airport on the same day.

77.     Upon arrival, at approximately 2330 hours, ALIABADI was referred to secondary

inspection by CBP officers, whereupon he appeared very angry and upset for always being

selected for questioning. Upon inspection, ALIABADI told CBP officers that his purpose for

travel outside the U.S. was business, in which he stated that he sold hydraulic motors.

ALIABADI also stated he was self-employed with a company named GOLDEN GATE

INTERNATIONAL LLC located at his home in Manchester, NH. ALIABADI stated he visited

Germany, U.K. and Turkey, but was later asked if he visited any other countries, to which he

replied no.

78.     During the inspection, ALIABADI stated he became a U.S. citizen in 2016 and

that he was born in Iran. CBP officers asked ALIABADI if he had an Iranian passport to which

he replied yes and told CBP officers they had no authority to see it. CBP officers then explained

their statutory border inspection authority, and ALIABADI then provided his Iranian passport for

inspection.  A review of the Iranian passport by CBP revealed that ALIABADI travelled to Iran

in June 2017, for three weeks on said travel document. CBP then asked ALIABADI if he had

conducted any business in Iran, to which he stated no, and became very upset.  When asked if he

brings any business to Iran or back to the U.S. from Iran he became very angry and would not

discuss any issues. Finally, CBP officers asked ALIABADI if he brought anything from the U.S.

to Iran or from Iran to the U.S., to which he stated only toiletries, acknowledging current U.S.

embargo sanctions against Iran. A search of all bags was conducted with negative findings, and ALIABADI departed the inspection area without further incident.

79.     Subsequent PNR checks revealed that email account **aiden.** [ ] **@gmail.com** was associated with the reservation for ALIABADI's travel in June and July of 2017.

80.     I conducted credit bureau reporting checks, which revealed that as of October 2017, ALIABADI was linked to an address located at [ ] Rachel Drive, Apt. 4, Jackson, TN 38305.  Driver license checks revealed that on October 17, 2017, ALIABADI was issued a Tennessee driver license, bearing the aforementioned Jackson address, and expiring on October 17, 2025. In addition, checks revealed that ALIABADI's New Hampshire driver's license has been surrendered.

81.     Based on the aforementioned analysis of ALIABADI's EEI filings data, PNR data, CBP inspection reporting and USCIS interviews, along with analysis of his emails, your affiant believes that ALIABADI has demonstrated a willingness to provide conflicting statements to U.S. law enforcement officers and conceal his business and travel activates involving U.S. exports to Iran. In addition, I believe that ALIABADI continues to operate in a manner to conceal that he is involved in illegally exporting commercial and dual use items through transshipment ports, to the Islamic Republic of Iran.  Further, there is probable cause to issue the proposed search warrants for email accounts [ ] **other@gmail.com** for the period of January 2014 until July 2016; [ ] **2000@hotmail.com** for emails to and from [ ] other@gmail.com, [ ] fxx@gmail.com, [ ] intllc@gmail.com, [ ] @gmail.com, aliabadi [ ] @gmail.com, and aiden. [ ] @gmail.com from January 2014 to present; and [ ] **_trading_co@yahoo.com** for emails to and from

other@gmail.com,          xx@gmail.com,             intllc@gmail.com,

fxx6@gmail.com, aliabadi          @gmail.com, and aiden.          @gmail.com  from

January 2014 to present.

82.     In general, an email that is sent to a Google, Yahoo, or Microsoft subscriber is

stored in the subscriber's "mail box" on Google, Yahoo, or Microsoft servers until the subscriber

deletes the email.  If the subscriber does not delete the message, the message can remain on the

provider's servers indefinitely. Even if the subscriber deletes the email, it may continue to be

available on a provider's servers for a certain period of time.

**BACKGROUND CONCERNING EMAIL**

83.     In my training and experience, I have learned that Google, Yahoo, or Microsoft

("the Providers") provide a variety of on-line services, including electronic mail ("email")

access, to the public.  The Provider allows subscribers to obtain email accounts at the domain

names yahoo.com, gmail.com, and Hotmail.com, like the email accounts listed in Attachments

A.  Subscribers obtain an account by registering with a provider.  During the registration process,

the provider asks subscribers to provide basic personal information.  Therefore, the computers of

the Providers are likely to contain stored electronic communications (including retrieved and

unretrieved email for subscribers) and information concerning subscribers and their use of the

provider's services, such as account access information, email transaction information, and

account application information.  In my training and experience, such information may constitute

evidence of the crimes under investigation because the information can be used to identify the

account's user or users.

84.     In my training and experience, email providers generally ask their subscribers to

provide certain personal identifying information when registering for an email account.  Such

27

information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

85.     In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

86.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as

a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

87.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by the email provider can show how and when the account was accessed or used.  For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email).  Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in

the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## **CONCLUSION**

88.     Based on the forgoing, I request that the Court issue the proposed search warrants. Because the warrants will be served on Google, Yahoo, and Microsoft, who will then compile the requested records at a time convenient to them, reasonable cause exists to permit the execution of the requested warrants at any time in the day or night.

Respectfully Submitted,

/s/ Benjamin Hickok
Benjamin Hickok
Special Agent
Department of Commerce
BIS/Office of Export Enforcement

Sworn and subscribed to me before this  24  day of July, 2018, in Concord, New Hampshire.

Daniel J. Lynch
United States Magistrate Judge

## <u>ATTACHMENT A</u>

### Property to Be Searched

This warrant applies to information associated with ▢▢▢ 2000@hotmail.com that is stored at premises owned, maintained, controlled, or operated by Hotmail (Microsoft), a company headquartered at One Microsoft Way, Redmond, Washington.

**ATTACHMENT B**

**Particular Things to be Seized**

**I.     Information to be disclosed by Google (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.     The contents of all emails to and from ____other@gmail.com, ____@gmail.com, ____intllc@gmail.com, ____@gmail.com, aliabadi.____@gmail.com, and aiden.____@gmail.com, from January 2014 through the present, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.     The types of service utilized;

d.      All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

The Provider is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes evidence of violations of 50 U.S.C. 1701-1706 (International Emergency Economic Powers); 18 U.S.C. 554 (Smuggling); 31 C.F.R 560.203, 560.204, and 560.206 (regulations prohibiting the export of U.S. goods to Iran); and Title 18, United States Code, Section 371 (conspiracy), those violations involving Hamed Aliabadi a.k.a. Aiden Davidson, and/or Golden Gate International, LLC, and occurring after January 2014, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) All communications relating to the possible identification, procurement, purchase, preparation, packaging, description, valuation, invoicing, licensing, concealment, sale, supply, transportation, exportation, shipment, or trans-shipment of goods from the United States or other countries to Iran, including communications relating to payments and receipt of payments for said transactions;

(b) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(c) Evidence indicating the email account owner's state of mind as it relates to the crimes under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(e) The identity of the person(s) who communicated with the user ID about matters relating to the crimes under investigation, including records that help reveal their whereabouts.